BARRY, Judge.
An injured worker claims “odd lot” status and appeals the denial of additional benefits.
On June 22, 1981, 21 year old Donald Cupit, a pool worker for Amax Nickel, Inc., sustained a thermochemical burn when his left foot slipped into an electrolyte solution. Continental Insurance Company paid benefits until Cupit returned to work on September 19, 1981. A year later, September 22, 1982, the insurer reinstituted payments based on a medical reassessment and paid benefits [1] under the Scheduled Loss Section of the Worker’s Compensation Act.[2]
Cupit contends the trial court erred by not finding him totally or partially permanently disabled under the “odd-lot” doctrine. Lattin v. HICA Corp., 395 So.2d 690 (La.1981). He argues the trial judge ignored his and the treating physician’s testimony which established that he works in pain and defendants offered no contrary proof. He reurges his demand for penalties and attorney’s fees.
Cupit was hospitalized for eight days at Chalmette General Hospital and was transferred to Methodist Hospital for two weeks. Dr. Howes, plastic surgeon, per *396 formed debridement and grafting procedures. He testified Cupit sustained a third degree burn over the dorsal and lateral aspect of the left ankle. After discharge from the hospital (22 days post accident) Dr. Howes saw Cupit four times through September 16. On September 25, 1981 Howes advised Underwriters Adjusting Company that the wound “had completely healed ... by 9/16/81 and [Cupit] was able to return to work on 9/21/81” without permanent disability.
On May 25, 1982 (11 months post accident) Cupit experienced pain and trouble with his boot when standing for long periods. Dr. Howes’ examination revealed a hypertrophic area, the skin was thicker, and the wound was continuing to scar. That, he said, causes a problem when the burn is over a flexion area because the skin needs to move for proper function. Dr. Howes saw Cupit on March 12, 1983 and said he complained of pain and difficulty with his boot. Cupit was told to use padding in the boot and was advised he may eventually need an orthopedic shoe to relieve pressure on the scar.
Dr. Howes saw Cupit for the last time on April 16, 1983 and his evaluation and recommendation were the same. In his deposition (one week before trial) he did not recommend an orthopedic shoe, excision, regrafting or release of the scar. However, he said these were future possibilities.
Originally Dr. Howes assigned a 25% disability of the left foot and ankle and 5% total body disability. Twenty-two months later he said the foot disability was the same but added plaintiff had lost 10% of his normal range of motion. Dr. Howes attributed the disability to pain and limitation of motion from the scar and stated the disability would not decrease. He said, “If anything, I think [the disability] is going to increase, since that has been his course up to this point ...”
Dr. Howes said Cupit did not relate his pain to job activities, but added he did not know what Cupit’s work entailed. He did not feel Cupit was incapable of any type of employment.
Dr. DiVincenti, a general and thoracic surgeon, examined Cupit on October 4, 1982 (15 months post accident) at the request of the insurer. He found “the patient's main problem, at this time, is a sensitive healed burn scar ...” and “... a 5% partial permanent disability ...”
Cupit testified he returned to work only because benefits were discontinued and he had to earn a living. His work required climbing stairs and walking conveyor belts. He insisted he could not work because of foot pain and wearing any boot irritated the injury. The only solution was to work without boots. He stated that twice a day he would remove his boots, prop up his foot, and massage it. He said that he could “barely” do his job and complained of pain to his foreman, Angelo Salodino, and the company nurse. He left work early on several occasions within the first month and a half after returning (but not since) “because I worked in pain. I have to make a living.”
Cupit testified he returned to work only to make enough money to meet expenses. However, the record shows Cupit had a good attendance record and worked substantial overtime: 299.75 hours in 1982 and 78.5 hours through April, 1983.
The employer called four employees to rebut Cupit’s testimony. John Brouillette, personnel administrator, testified that after Cupit’s return in 1981, his first absences were in January, 1982 and were not related to the injury. In February, 1982 Cupit took a two week leave to care for his ill grandfather.[3] Brouillette stated Cupit had a very good attendance record which is borne out by the “Absence record” in evidence. He occasionally missed a day but none of the records show absences related to this injury. Brouillette stated Cupit never complained of pain or having to wear a work boot.
*397 Angelo Salodino, one of Cupit’s supervisors, testified during the first week after Cupit returned to work he complained of trouble with his boots. New boots were issued and no subsequent complaints were made. He also stated Cupit was a good worker, never complained of pain (after the initial week), and always performed his work.
Charles Holliday, supervisor of safety and security, testified that he normally received from the company nurse and supervisors all reports concerning complaints by an employee of inability to work, but never received a report on Cupit.
Gary Caro, assistant supervisor, testified if any one complains on any shift in his area he would receive a report. He received no pain complaint from Cupit or that he couldn’t work.
Joseph Miceli, a private investigator, secretly filmed Cupit one week before trial apparently giving baseball lessons to some children. The tape was shot over a 3V2 hour period and runs less than one hour. It shows Cupit walking, trotting and running without apparent difficulty and contradicts his testimony that “I can't play ball.”. This activity has no bearing on whether Cupit works in substantial pain, but does relate to his credibility.
The “odd lot” doctrine was adopted in Oster v. Wetzel Printing, Inc., 390 So.2d 1318 (La.1980) and provides that a claimant is entitled to total and permanent disability if he establishes that because of his physical impairment and other factors — mental capacity, training, education — he can perform no service other than those so limited in quality or dependability that a reasonably stable market does not exist. The “odd-lot” classification also applies to a worker who cannot return to “any gainful employment” without suffering substantial pain. Wilson v. Ebasco Services, Inc., 393 So.2d 1248 (La.1981). The “substantial pain” employee is entitled to partial disability benefits (23:1221(3)) if he is unable to perform the duties in which he was customarily engaged when injured or duties of the same or similar character for which he is fitted by training, education or experience, even if he can engage in some other work without pain. Ramsey v. Dragon Ltd., 448 So.2d 745 (La.App. 4th Cir.1984).
As to the burden of proof, this Court recently said:
A compensation claimant who alleges disability due to substantial or appreciable pain must establish that condition to a reasonable certainty and by a fair preponderance of the evidence. Dusang v. Henry C. Beck Builders, Inc., 389 So.2d 367 (La.1980). A claimant is not disabled solely because of some residual pain or discomfort. Pain is disabling only if it is substantial. Culp v. Belden Corp., 432 So.2d 847 (La.1983). Whether a claimant has met this burden is a question of fact based on the totality of the lay and medical evidence. The trial court’s resolution has great weight and will not be disturbed absent manifest error.
Crisp v. Southern Silk Screen, Inc., 451 So.2d 1260 (La.App. 4th Cir.1984)
The time of trial is the criteria to determine the worker’s condition. Ramsey, supra.
Clearly, Dr. Howes did not feel Cupit could not engage in any employment. Nor did Dr. Howes state he could not perform his customary duties because of pain. Even though Dr. Howes was never told what his duties were, he did say Cupit did not relate pain to his work. The trial judge, while recognizing Cupit could become disabled in the future, held that on the date of trial he was neither totally nor partially disabled and denied further benefits.
The trial judge’s finding is supported by the evidence. All of the co-employees testified that Cupit never complained or missed work because of his injury. The attendance records and overtime sheets also support their testimony. Cupit did not produce testimony from co-workers or provide any evidence to establish by a fair preponderance that he is disabled. However, if *398 his condition deteriorates, as anticipated by Dr. Howes, Cupit can seek modification of this judgment. LSA-R.S. 23:1331.
Cupit is not entitled to penalties and attorney's fees. Compensation was discontinued on September 17, 1981 based on Dr. Howes’ letter advising that Cupit could return to work. Compensation began again when Dr. Howes revised his opinion. Defendants’ actions were not arbitrary, capricious or without probable cause.
The judgment of the trial court is affirmed.
AFFIRMED.

. Payments began September 22, 1982 but were retroactive to August 16, 1982. It was stipulated that Continental Insurance paid Cupit $7,661.00 compensation and medicals of $10,120.81.

. 23:1221(4)(g), (o) provides:
(4) In the following cases, the compensation shall be as follows:
******
(g) For the loss of a foot, sixty-six and two-thirds per centum of wages during one hundred and twenty-five weeks.
******
(o) In all cases involving a permanent partial loss of the use or function of the members mentioned hereinabove, compensation shall bear such proportion to the amounts named herein for the total loss of such members as the disability to such members bears to the total loss of the member, provided that in no case shall compensation for an injury to a member exceed the compensation payable for the loss of such member.

. The request form for the leave is in the record and signed by Donald Cupit.